UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAN C. TORRES PAGAN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil No. 16-30060-MGM |
| NANCY A. BERRYHILL,[1] | * |
| Acting Commissioner of Social Security, | * |
| | * |
| Defendant. | * |

<u>MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION TO REVERSE THE COMMISSIONER'S
FINAL DECISION AND DEFENDANT'S MOTION
TO AFFIRM THE COMMISSIONER'S DECISION</u>
(Dkt. Nos. 16 and 20)

September 29, 2016

MASTROIANNI, U.S.D.J.

## I.  INTRODUCTION

This is an action for judicial review of a final decision by the acting Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1383(c)(3) (referring to 42 U.S.C. § 405(g)). Jan C. Torres Pagan ("Plaintiff") asserts that the Commissioner's decision denying him SSI—memorialized in a May 21, 2013 decision of an administrative law judge ("ALJ")—rested on legal error. Plaintiff has filed a motion to reverse that decision and the Commissioner has moved to affirm. For the reasons set forth below, the court allows the Commissioner's motion (Dkt. No. 20) and denies Plaintiff's motion (Dkt. No. 16).

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is substituted automatically as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

## II. BACKGROUND

Plaintiff was born in December of 1994. (Administrative Record ("A.R.") 153.) He received a bilingual education up to the ninth grade and testified before the ALJ that he intended to take GED classes and hoped to ultimately complete trade courses in auto-body repair or engineering. (*Id.* at 183-84.) He has never been employed and received SSI benefits between 2006 and 2013, from the ages of 12 and 19. (*Id.* at 60, 135.) Plaintiff initially qualified for SSI in June of 2006 upon application by his mother, Lilliam Pagan ("Ms. Pagan"), who also receives social security benefits for "bipolarity" and anxiety, when the Commissioner found that his condition satisfied Listing 112.05 requirements for "Mental Retardation."[2] (*Id.* at 34, 60.) Plaintiff received SSI benefits on that basis until approximately July 3, 2013, when the Commissioner "redetermined" his disability status pursuant to the Work Opportunity Reconciliation Act of 1996 ("PRWORA"), which requires the Commissioner to review eligibility of all SSI recipients under standards applicable to adults within one year of an individual's 18th birthday. (A.R. 13, 50; *see also* 20 C.F.R. § 416.987 (outlining scope and procedures for "[d]isability redeterminations for individuals who attain age 18.")) Plaintiff then petitioned for reconsideration in November of 2013, but failed to show up at a subsequent hearing before a Disability Hearing Officer who, after receiving no response to his inquiries, concluded from the record before him that Plaintiff was able to find and perform limited work despite limitations caused by a learning disability. (*Id.* at 60-65.) Plaintiff then sought review before an ALJ, who effectively affirmed the Hearing Officer's decision after a hearing at which Plaintiff and his mother testified. (*Id.* at 7-21.) The Social Security Administration Appeals Council denied review in February of 2016, (*id.* at 1), and Plaintiff initiated this action for judicial review in April of the same year, (Dkt. No. 1).

---

[2] Listing 112.05 D is now generally known as the "Intellectual Disability" Listing. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

## A. Medical Evidence in the Administrative Record

During the redetermination process, Plaintiff asserted disability due to three conditions: "learning disorder, psychiatric issues, and hearing loss." (A.R. 60.) His "Disability Report" forms—the primary documents in the record through which Plaintiff provided information concerning his alleged disabilities—primarily provided information regarding psychiatric issues and treatment. The first, dated July 26, 2013, indicated that "Valley Psychiatrics" treated him for "psychiatric issues" and provided "counseling and medications" (*Id.* at 147). A second form—evidently created in mid-2014, several months after the agency's initial determinations that Plaintiff was not disabled—again listed Valley Psychiatrics as a medical provider. (*Id.* at 156.) The reason for his visits were by then described with one word—"suicidal"—and the treatment received listed as "home visit counceling" [sic]. (*Id.*) In a third form, also from mid-2014, Plaintiff provided that "[t]he doctor told me . . . my condition was that I have bypolarness [sic], [a]nxiety, and problems sleeping." (*Id.* at 173.) The same form listed medications for "bypolarness," sleeping issues, anxiety, bipolar disorder, and migraines, each prescribed by Candace O'Brien, CNS, of Valley Psychiatrics. (*Id.* at 175.)

Plaintiff had a consultative psychological evaluation at Hartford Psychological Services on June 26, 2013, with Dr. Rafael Mora de Jesus, Ph. D. (*Id.* at 183.) Plaintiff reported to Dr. Mora de Jesus that he was not taking any medications, cared for his child while his spouse attended school, and that his "main disabling condition is having undergone surgery in his nose due to problems" stemming from childhood surgeries on his throat and ears, which he said caused him nosebleeds when in the sun, problems breathing, and pain in the jaw when lifting heavy objects. (*Id.* at 183-185.) After administering TONI-IV cognitive testing, the doctor concluded that Plaintiff had a non-verbal IQ of 84, which he deemed "below average," average reading skills, borderline math skills, and self-

3

care skills within "normal limits." (*Id.* at 185-86.) Diagnosis included a Global Assessment of Functioning ("GAF") score of 70[3] and "Learning Disability (math related)." (*Id.* at 186.)

One month prior, Plaintiff underwent a consultative physical examination with an otolaryngologist, Dr. Robert Osofsky. (*Id.* at 15, 177-82.) Dr. Osofsky's report recited Plaintiff's account of experiencing hearing loss for approximately ten years after receiving surgery for an ear infection. (*Id.* at 177.) Osofsky reported cleaning Plaintiff's ears of wax and performing an audiogram for both ears that resulted in a finding of "normal, except for a very mild high frequency sensorineural loss in both ears." (*Id.*). He concluded there was no significant ear or hearing pathology and that Plaintiff's "hearing should in no way restrict [his] activities or ability to work." (*Id.*)

Finally, on July 2, 2013, a state agency psychological consultant, John Perlman, Ed. D., reviewed the evidence described above and performed a Mental Residual Functional Capacity Assessment. (*Id.* at 188-91.) Perlman generally assessed Plaintiff was without significant mental limitations, finding only moderate limitations in the ability to understand and follow detailed instructions, to concentrate for extended periods, and to complete work-days without interruptions from psychological symptoms or without regular rest periods. (*Id.* at 188-89.) Perlman also found mild limitations amounting to "restrictions of activities of daily living" and "difficulties in maintaining social functioning." He found "moderate" limitations causing difficulties in maintaining concentration. (*Id.* at 202.) Perlman ultimately assessed that Plaintiff was able to understand and

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders, Fourth Ed., Text Revision, 32 (2000). A score between 71 and 80 denotes temporary, expectable reactions to stressors and no more than slight impairment. *Id.* at 34. A score between 61 and 70 denotes "mild" symptoms or limitations. *Id.* A score between 51 and 60 denotes "moderate" symptoms or limitations. *Id.* A score between 41 and 50 denotes "serious" symptoms or limitations. *Id.*

4

remember simple instructions, to complete simple and routine tasks, concentrate for at least two hours in "simple 1 and 2 step tasks," and relate in a socially appropriate manner. (*Id.* at 190.)

**B.     Testimony before the ALJ**

Plaintiff, his mother, and a vocational expert testified before ALJ Leonard J. Cooperman on October 21, 2014. (*Id.* at 22-45.) Plaintiff appeared *pro se*[4] and after the ALJ advised him of his right to an attorney, noting that appearing through "an attorney may be more beneficial" to his interests, Plaintiff declared that he nevertheless wanted to proceed without representation. (*Id.* at 25-27.) The ALJ then confirmed in informal terms that Plaintiff understood the purpose of the proceeding was to determine whether he still "deserve[d] to be on [SSI] benefits" or needed to "look for a job . . . or be in school." (*Id.* at 31-32.) After Plaintiff indicated his mother was attending and intended to assist him at the hearing because of her knowledge and involvement in his initial 2006 SSI application, the ALJ directed questions to her through a Spanish interpreter. (*Id.* at 33-35.) Ms. Pagan then testified that Plaintiff originally qualified for SSI because he had been "unable to hear and to speak [or] to retain anything at school." (*Id.* at 35-36.) She then acknowledged Dr. Osofsky's conclusion that Plaintiff had no hearing problems and, when asked why he should remain on SSI, made vague reference to psychiatric issues and medication, presumably those involving Valley Psychiatrics. (*Id.* at 35-36.) Upon learning that Ms. Pagan had no knowledge of the consultative psychological evaluation that, in the ALJ's terms, concluded that Plaintiff was "relatively normal," the ALJ adjourned the hearing to allow Plaintiff and his mother to review that report. (*Id.* at 36-38.)

After that adjournment, Ms. Pagan did not immediately continue her testimony. Rather, Plaintiff took the stand and acknowledged the psychological report's accuracy but asserted he nevertheless qualified for SSI because he couldn't "work in the sun [without getting a] headache [or] lift heavy stuff" without pain (*Id.* at 38-40.) The ALJ then swore in a vocation expert who testified to

---

[4] Plaintiff is represented by counsel in the present action.

the availability of various jobs requiring only light, unskilled work indoors, including work as a cashier or cleaner. (*Id.*) The ALJ then asked Plaintiff if there was any reason he could not perform such work, and Plaintiff answered that there was not. (*Id.* at 41.) The ALJ then questioned Plaintiff's mother on the same point who, after initially professing confusion as to the questions posed, stated she would not contradict her son's testimony.[5] (*Id.* at 41-43 ("If he says he's able to do that, I will not say against—I could not go against his words.")) Before the hearing concluded the ALJ invited Plaintiff to provide any other testimony he wanted considered, and Plaintiff responded that he experienced anxiety, sleeping problems, and "bipolarity," but then indicated that the medication he received for those issues "help[ed] him now," implying that those problems were alleviated by medication and had been worse in the past. (*Id.* at 44.) On that note substantive testimony concluded.

### III.  STANDARD OF REVIEW

The role of a district court reviewing an administrative law judge's decision is limited to determining whether the conclusion was supported by substantial evidence and based on the correct legal standard. *See* 42 U.S.C. §§ 405(g) and 1983(c)(3); *Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996). The Supreme Court has defined substantial evidence as "'more than a mere scintilla.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). Even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health &*

---

[5] Although her testimony was less than clear, Ms. Pagan also voiced doubts that her son could work a job requiring him to "stand up all day." (*Id.*)

*Human Servs.,* 647 F. 2d 218, 222 (1st Cir. 1981)). Additionally, it is the Commissioner's responsibility to weigh conflicting evidence and decide issues of credibility. *Rodriguez,* 647 F.2d at 222.

## IV. DISABILITY STANDARD AND THE ALJ'S DECISION

Entitlement to SSI requires a showing of both disability and financial need on or after the date of the SSI application. *See* 42 U.S.C. § 1381a. Plaintiff's financial need is not challenged. Therefore, whether Plaintiff has a disability within the meaning of the Act to qualify for SSI is the only issue at hand.

The Act defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled under the Act:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner must apply a five-step protocol described by the First Circuit as follows:

> 1) If the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey v. Barnhart,* 276 F.3d 1, 5 (1st Cir. 2001); *see also* 20 C.F.R. § 416.920(a)(4).

In the instant case, the ALJ applied a different seven-step analysis known as the "medical improvement standard" that is generally reserved for determining whether an adult's disability is on-going and continues to inhibit their ability to work.[6] *See Franceschi v. Colvin*, No. 15-CV-11125-IT, 2016 WL 5349477, at *16 (D. Mass. Aug. 30, 2016), *report and recommendation adopted*, No. 15-CV-11125-IT, 2016 WL 5346934 (D. Mass. Sept. 23, 2016). Under that rubric, the ALJ first pinned the 2006 determination that Plaintiff was disabled due to "mental retardation" as the "comparison point decision" ("CPD"). (A.R. 14-15). He then preliminarily found that the evidence before him established only one current impairment, "learning disability," as found by Dr. Mora de Jesus, with specific reference to that doctor's finding that Plaintiffs "non-verbal score was 84, some 20 points higher than it was . . . in 2006." (*Id.* at 15.) As for Plaintiff's other complaints, the ALJ found no additional medically determinable impairments, citing Dr. Osofsky's report and an overall absence of medical evidence relating to headaches, or jaw pain while lifting heavy objects. (*Id.*) Proceeding to step one of the medical improvement standard, the ALJ determined that Plaintiff's impairment did not meet or equal the listings set forth in 20 C.F.R. Part 404, subpart P, Appendix 1. (*Id.* at 16.) At step two, he found that Plaintiff experienced medical improvement as of July 3, 2013, due to a "decrease in medical severity of the impairment present at the time of the CPD." (*Id.* at 16.) He then found at step three that the improvement was related to the ability to work, which required him to skip to step five, where he found that Plaintiff continued to have a "severe" mental impairment. At step six, the ALJ found Plaintiff had a residual functional capacity ("RFC") to perform light work with limitations prohibiting sun exposure and requiring simple instructions. (*Id.* at 16.) Finally, at

---

[6] As the Commissioner concedes in her briefs, the ALJ applied this standard in error. (Dkt. No. 21 at 3-4, n. 2). Plaintiff, however, does not assert this error as grounds for reversal and any argument based on this error would nevertheless be unavailing. *See, e.g.*, *Lloyd v. Colvin*, No. 4:14-CV-00040, 2015 WL 5690817, at *3 (W.D. Va. Sept. 28, 2015) (holding the error "harmless" because the medical improvement standard "fits within the proper legal framework.") (citations omitted).

8

step seven the ALJ relied on the vocational expert's testimony in finding that Plaintiff could perform work within those limitations and existing in significant numbers in the national economy. (*Id.*). On that basis, the ALJ concluded Plaintiff was not disabled. (*Id.*)

## V. ANALYSIS

Plaintiff makes three arguments in his opening brief and another in his reply. As explained below, each argument lacks merit and the fourth was, in any event, waived by Plaintiff's failure to raise it in his opening brief. Plaintiff's first argument is that the ALJ failed to adequately to develop the record with respect to his psychiatric complaints. He contends that reference in his SSA-3441 form to "suicidal ideation" and "home counseling" triggered the ALJ's duty to obtain records from Valley Psychiatrics that, he asserts, "would have strongly supported a finding of disability." (Dkt. No. 17 at 3-4, 7.)

"Because Social Security proceedings are not adversarial in nature," the Commissioner has a duty to "to develop an adequate record from which a reasonable conclusion can be drawn." *Heggarty v. Sullivan*, 947 F.2d 990, 997 (1st Cir. 1991) (quoting *Currier v. Sec'y of HEW,* 612 F.2d 594, 598 (1st Cir.1980). This responsibility "increases" when various factors are present, including when a claimant is unrepresented, when a claim "seems on its face to be substantial," and when there are "gaps in the evidence necessary to a reasoned evaluation of the claim" that may be filled without "undue effort." *Currier*, 612 F. 2d at 598. An ALJ's duty to develop the record is also "greater when the claimant is obviously mentally impaired." *Deblois v. Sec'y of Health & Human Servs.*, 686 F.2d 76, 81 (1st Cir. 1982) (citing *Currier*). Nevertheless, "remand is appropriate only where the court determines that further evidence is necessary to develop the facts of the case fully, that such evidence is not cumulative, and that consideration of it is essential to a fair hearing." *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 139–40 (1st Cir. 1987).

9

Here, the Court concludes the record was adequately developed despite Plaintiff's *pro se* status and despite evidence of some mental impairment. The ALJ fairly relied on Plaintiff's testimony that he could perform work within certain limitations, testimony corroborated by Dr. Mora de Jesus's consultative report, Plaintiff's acknowledgement that report was accurate, and, to some extent, Ms. Pagan's testimony. *C.f. Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991) (stating that an ALJ is entitled to rely on claimants' statements regarding their own functional limitations); *Lopez v. Comm'r Of Soc. Sec.*, 6 F. App'x 48, 49 (1st Cir. 2001) ("Only when the ALJ is alerted by the record to the presence of an issue must the ALJ further develop the record.") (citations and quotation marks omitted). Under these circumstances, the ALJ "could reasonably conclude that requesting supplemental information would have provided little insight." *Ribeiro v. Barnhart*, 149 F. App'x 7, 8 (1st Cir. 2005). In short, Plaintiff's contention that consideration of his psychiatric records "would have strongly supported a finding of disability" remains speculative and overlooks all contradictory evidence from which the ALJ inferred that Plaintiff was able to perform limited work.

Plaintiff's second and third arguments are unpersuasive for similar reasons. Plaintiff contends that the ALJ erred by (i) failing to state which impairments he found severe in his "step 2 determination" and (ii) failing to use the "special technique" prescribed by 20 C.F.R. §§ 404.1520a(b)-(d) and 416.920a(b)-(d) in determining whether Plaintiff's impairment was severe. (Dkt. No. 17 at 7-9.) The first of these contentions plainly misreads the ALJ's decision, which found only one medically determinable impairment ("learning disability") that could be deemed severe. The second contention is technically correct, as the Commissioner acknowledges, (*see* dkt. No. 21 at 17), but the error is harmless. Sections 404.1520a and 416.920a apply at step two of the five-step protocol and prescribe a certain "technique" involving a range of scores across specific functional categories for evaluating whether mental impairments are "severe" and whether the analysis

therefore continues to step three or ceases with a finding that a claimant is not disabled. Here, the ALJ concluded that Plaintiff's impairment was severe. Remanding for a more explicit application of those standards would therefore have no conceivable impact on Plaintiff's application. *See, e.g.*, *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 81 (D. Mass. 2004) (affirming despite failure to apply special technique "where remand would only confirm the ruling in [claimant's] favor at step two.")

Plaintiff raised a final argument in his reply brief, and his reasoning at this point is not altogether clear. He argues that the Commissioner erred and created an "obvious gap" in the record by failing to obtain and review IQ tests and other materials generated during his 2006 SSI application, which he presumes "must have been obtained by the Commissioner . . . in order to find him intellectually disabled during this [earlier] period of time." (Dkt. No. 22 at 4.) He appears to further argue this gap is material in light of holdings by several courts in the District of Maine that effectively impose of a rebuttable presumption that "a person's IQ remains fairly constant throughout life." (*Id.* at 1) (quoting, *inter alia*, *Mace v. Astrue*, No. CIV. 08-14-B-W, 2008 WL 4876857, at *4 (D. Me. Nov. 11, 2008)). This argument was waived in Plaintiff's opening brief. *See United States v. Evans-Garcia*, 322 F.3d 110, 114 (1st Cir. 2003) ("Arguments raised for the first time in reply briefs are generally deemed waived.") It is, moreover, unpersuasive. No gap concerning Plaintiff's IQ appears in the record; Dr. Mora de Jesus's consultative examination addressed that topic directly and reported a non-verbal score of 84. (A.R. 184.) The ALJ referenced Plaintiff's IQ score in his written decision and on that basis concluded that the "condition for which [the plaintiff] was placed on benefits has significantly improved" (A.R. 15-16.) The same would serve to rebut any presumption of constant IQ levels, assuming such a presumption might apply in this scenario.

In summary, this court must uphold the ALJ's determination if it was supported by substantial evidence, even if the available evidence could have supported other determinations, and even if a different administrative law judge may have reached a different conclusion when reviewing

11

the record. *See Bird v. Colvin,* No. 14-cv-30108-MGM, 2015 WL 5315196, at *7 (D. Mass. Sept. 11, 2015). Substantial evidence supports the conclusion reached by the ALJ in this case and the record was adequately developed.

## VI.    CONCLUSION

For these reasons, the court DENIES Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 16) and ALLOWS the Defendant's Motion for Order Affirming Decision of the Commissioner (Dkt. No. 20). The clerk shall enter judgment for Defendant, and this case may now be closed.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge